**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3112
_____

SIMON CAMPBELL; PENNSYLVANIANS FOR UNION REFORM,
Appellants
v.

PENNSYLVANIA SCHOOL BOARDS ASSOCIATION; MICHAEL
FACCINETTO, SOLELY IN HIS INDIVIDUAL CAPACITY; DAVID
HUTCHINSON; SOLELY IN HIS INDIVIDUAL CAPACITY; OTTO W. VOIT,
III, SOLELY IN HIS INDIVIDUAL CAPACITY; KATHY SWOPE, SOLELY IN
HER INDIVIDUAL CAPACITY; LAWRENCE FEINBERG, SOLELY IN HIS
INDIVIDUAL CAPACITY; ERIC WOLFGANG, SOLELY IN HIS INDIVIDUAL
CAPACITY; DANIEL O'KEEFE, SOLELY IN HIS INDIVIDUAL CAPACITY;
DARRYL SCHAEFER, SOLELY IN HIS INDIVIDUAL CAPACITY; THOMAS
KEREK, SOLELY IN HIS INDIVIDUAL CAPACITY; AND LYNN FOLTZ,
SOLELY IN HER INDIVIDUAL CAPACITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2-18-cv-00892)
District Judge: Honorable Jan. E. Dubois
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 20, 2019
_____

Before: McKEE, SHWARTZ, and FUENTES, *Circuit Judges*.

(Filed: August 27, 2020)

Jacob C. Cohn
Eric C. Rosenberg
Ilan Rosenberg

Joshua Slavitt
Gordon Rees Scully Mansukhani
Three Logan Square
1717 Arch Street, Suite 610
Philadelphia, PA 19103

Mary Catherine Roper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102

*Counsel for Appellants*

David W. Brown
Craig D. Ginsburg
Michael I. Levin
Levin Legal Group
1800 Byberry Road
1301 Masons Mill Business Park
Huntingdon Valley, PA 19006

*Counsel for Appellees*

_____

## OPINION
_____

McKEE, *Circuit Judge*.

In this dispute over dueling claims to *Noerr-Pennington* immunity, Simon Campbell and his organization, Pennsylvanians for Union Reform (collectively, "Campbell"), allege that the Pennsylvania School Boards Association and its Board Members (collectively, "PSBA") violated Campbell's civil rights by suing him in state court (the "State Suit"). That complaint asserted various tort claims against Campbell based on his persistent use of Pennsylvania's Right to Know laws. According to PSBA's State Suit allegations, Campbell's relentless pursuit of information about PSBA, and his related conduct, was an abuse of the Right to Know statute intended solely to harass PSBA. At that time, Campbell defended against the State Suit by arguing his conduct was

2

constitutionally protected under the *Noerr-Pennington* doctrine.

Now Campbell sues, seeking damages under 42 U.S.C. § 1983, alleging that the State Suit was intended as retaliation. PSBA defends against Campbell's civil rights claims by itself invoking *Noerr-Pennington*. It argues the First Amendment shields its right to sue in state court. The District Court agreed with PSBA and granted its motion for summary judgment.

We conclude that the District Court erred in requiring a heighted burden of proof on PSBA's motives in bringing its tort claims in state court. However, because we find that Campbell's civil rights claim would fail under any standard of proof, we agree that PSBA is entitled to judgment as a matter of law and will therefore affirm.[1]

## I.

Simon Campbell is an active and persistent user of the Pennsylvania Right to Know Law ("RTKL"), which permits citizens to obtain certain information from the state government and its agencies.[2] In recent years, he has submitted hundreds of requests to public school agencies across the Commonwealth. Many of the recipients are members of the PSBA. The PSBA is a non-profit association created by Pennsylvania's school districts "to further the interests of public education and to provide assistance to public school entities."[3] A majority of school boards in the state are members, and the organization's roots stretch back to the 19th century.[4]

Campbell founded Pennsylvanians for Union Reform ("PFUR") in 2013 to "eliminate compulsory unionism in Pennsylvania while promoting transparency and efficiency in

---

[1] "We may affirm a district court for any reason supported by the record." *Brightwell v. Lehman*, 637 F.3d 187, 191 (3d Cir. 2011) (citation omitted).

[2] 65 Pa. Cons. Stat. §§ 67.101 *et seq.* (2008).

[3] App. at 1576.

[4] *Id.* at 1589.

3

government for taxpayers."[5] In pursuing those goals, PFUR has energetically utilized the Commonwealth's RTKL to obtain records from PSBA's constituent school districts and other government entities. In the process, it has litigated cases that have expanded the reach of that law.[6]

In March 2017, PFUR turned its attention to the PSBA by sending RTKL requests to "most, if not all, public school agencies" in Pennsylvania.[7] These requests sought contact information for district employees and union representatives. PSBA's attorney, Emily Leader, responded by advising member school districts that they were required to release publicly available information, but they did not have to provide PFUR with private data such as personal email addresses.[8] PSBA later advised school districts that, although they were legally required to collate the requested information, they could simply make the results "available for pickup at the district offices," rather than forwarding it to PFUR. It also presciently informed its members that this relatively uncooperative approach might lead to litigation.[9]

When Campbell received copies of the PSBA's legal guidance, he established a page on the PFUR website entitled "PSBA Horror" with a mocking photograph of PSBA Executive Director Nathan Mains. The photograph included a word bubble which read: "Taxpayers, thanks for the $226,000 and the public pension! Now * * * * off, and drive to the school district if you want public records. And don't forget your check book."[10] Campbell had also requested PSBA's tax returns. When Michael Levin, PSBA's outside counsel, provided a link to those returns, Campbell caustically told Levin to "stay out of my business whenever I'm approaching one of your public

---

[5] *Id.* at 1587.

[6] *See, e.g.*, *Reese v. Pennsylvanians for Union Reform*, 173 A.3d 1143 (Pa. 2017); *Dep't of Human Servs. v. Pennsylvanians for Union Reform, Inc.*, 154 A.3d 431 (Pa. Commw. Ct. 2017) (en banc).

[7] App. at 1632.

[8] *Id.* at 94-99.

[9] *Id.* at 109-113.

[10] *Id.* at 1546.

4

entity clients." Levin responded by threatening to sue Campbell for defamation.[11]

Campbell soon poured gasoline on this burgeoning feud by submitting a second wave of RTKL requests in May. Approximately 600 school boards across Pennsylvania received an identical 17-page request asking their respective districts to provide 27 different types of documentation regarding their relationship with PSBA.[12] More than 240 of the school districts turned to PSBA for assistance in assembling that information. This overwhelming stream of requests led PSBA to adopt a policy of providing what it viewed as the minimum legally required response.[13] Levin also sent Campbell a demand that he take down the picture of Executive Director Mains. Campbell complied, but replaced it with an illustration of PSBA alongside a message similar to the original text.[14] Campbell also established a new website with his personal funds, www.psbahorror.com. He filled it with his anti-PSBA messaging through writing and videos he posted online.[15]

Nathan Mains eventually told PSBA's legal team that he wanted to sue Campbell for damaging PSBA's reputation.[16] In June 2017, the PSBA Board voted unanimously to sue Campbell and the resulting state tort action was filed the following month alleging defamation, tortious interference with contractual relations, and abuse of process.[17]

PSBA's then-president testified that the State Suit was filed to "stop" PFUR from "harassing districts with . . . unreasonable request[s] [and] to stop defaming members of the organization."[18] Mains announced the suit in an email to all PSBA members.[19] Later that year, Campbell and PFUR

---

[11] *Id.* at 1399-1401.
[12] *Id.* at 124-26.
[13] *Id.* at 1574, 1558.
[14] *Id.* at 1403.
[15] *Id.* at 1418, 1684.
[16] *Id.* at 1684.
[17] *Id.* at 780-831.
[18] *Id.* at 1825.
[19] *Id.* at 144.

removed all of the challenged content from their websites and stopped sending RTKL requests.[20]

In February 2018, as the State Suit proceeded, Campbell filed this action against PSBA and ten members of its board. His complaint alleges that PSBA's State Suit was motivated by an improper desire to retaliate against him for proper RTKL requests in violation of his First Amendment rights. Campbell seeks injunctive relief, as well as compensatory and punitive damages.[21]

PSBA moved for summary judgment. Its motion advanced multiple arguments, but we must consider only the claim that *Noerr-Pennington* doctrine shields PSBA from liability for filing the State Suit. The District Court agreed with this position and held that both Campbell's RTKL requests and PSBA's subsequent state tort claims were protected under *Noerr-Pennington*.[22] The Court found that PSBA's State Suit claims were objectively baseless. As we discuss later, this satisfied the first requirement for lifting *Noerr-Pennington* immunity. However, the District Court held that there was not clear and convincing evidence that the suit was "subjectively baseless." [23] Accordingly, the Court granted PSBA's motion for summary judgment and dismissed Campbell's civil rights claim without reaching the remaining contentions. This appeal followed.[24]

## II.

We review this summary judgment decision *de novo*, mindful of the special care called for by these issues of "free

---

[20] *Id.* at 1984.

[21] *Id.* at 56.

[22] *Campbell v. Penn. Sch. Bds. Assoc.*, 336 F. Supp. 3d 482, 494 (E.D. Pa. 2018).

[23] *Id.* at 504.

[24] Because this is a civil rights case arising under the United States Constitution, the district court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a). On appeal, we have jurisdiction under 28 U.S.C. § 1291.

6

expression."[25] As we noted at the outset, both sides seek shelter under *Noerr-Pennington* immunity. That doctrine shields constitutionally protected conduct from civil liability, absent certain exceptions.[26] Specifically, the doctrine's protective umbrella does not extend to "sham" suits, which seek to take advantage "of governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."[27] The parties' competing claims to *Noerr-Pennington* protection can more easily be resolved if we first examine the origins and history of the doctrine.

### A) Origins of Noerr-Pennington

"The *Noerr–Pennington* doctrine takes its name from a pair of Supreme Court cases that placed a First Amendment limitation on the reach of the Sherman Act."[28] In *Noerr*,[29] railroad companies, fearful of the growing power of the trucking industry, sought to use their considerable resources to encourage adoption of laws and regulations that would encumber truckers. The truckers responded by suing the railroad companies for violation of the Sherman and Clayton Anti-Trust Acts.[30] The case reached the Supreme Court, which held that the railroads' First Amendment rights to petition the government must override statutory limitations on anticompetitive behavior. The Court explained: "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms."[31] The Court soon extended this protection to efforts to influence executive action in

---

[25] *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)).

[26] *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus.* (*PREI*), 508 U.S. 49, 56 (1993).

[27] *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123 (3d Cir. 1999) (quoting *PREI*, 508 U.S. at 61 (emphasis in original)).

[28] *Hanover 3201 Realty, LLC v. Vill. Supermarkets*, 806 F.3d 162, 178 (3d Cir. 2015).

[29] *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

[30] *Id.* at 129; *see* 15 U.S.C. § 1, and 15 U.S.C. § 15, respectively.

[31] *Noerr*, 365 U.S. at 138.

7

*Pennington.*[32] There, the Court held that "efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal . . ."[33] The Court concluded that efforts to influence government action were protected from liability even if driven by an illicit intent.[34]

There was, however, one conceivable exception. In *Noerr*, Justice Black had observed in dicta that an ostensible petition which in reality "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor" would not deserve protection.[35] The Court subsequently established a carve-out for such behavior. *Noerr-Pennington* protection does not extend to an objectively "[b]aseless suit [that] conceals an attempt to interfere directly with a competitor's business relationships, through the use [of] the governmental process— as opposed to the outcome of that process—as an anticompetitive weapon."[36] This is referred to as the "sham" exception to *Noerr-Pennington* immunity.

### B) The Sham Exception

"A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay."[37] The difficulty, of course, comes in evaluating intent.

We employ a two-part test to determine if the sham exception applies. First, the suit must be objectively baseless. "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr* . . . ."[38] Whereas "sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure

---

[32] *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[33] *Id. at* 670.

[34] *Id.*

[35] *Noerr*, 365 U.S. at 144.

[36] *PREI*, 508 U.S at 50 (third alteration in original) (emphasis, internal quotation marks, and citations omitted).

[37] *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991).

[38] *PREI*, 508 U.S. at 60.

favorable relief."[39] The Supreme Court analogizes this inquiry to the common law tort of wrongful civil proceedings, which requires proof that the defendant (the plaintiff in the underlying action) lacked probable cause to bring that suit.[40] Mere ill intent does not suffice: "a showing of malice alone will neither entitle the wrongful civil proceedings plaintiff to prevail nor permit the factfinder to infer the absence of probable cause."[41]

Thus, if probable cause exists, our inquiry is at an end. However, the fact that a suit may lack any objective merit is not itself determinative. We must then inquire into the plaintiff's subjective motivations for bringing suit.[42] We take this additional step to ascertain whether the actual motivation is to dragoon the "governmental process" itself into use as a competitive tool.[43] In the economic realm, this often means examining "evidence of the suit's *economic* viability."[44] The difficulty of proving subjective motivation obviously "places a heavy thumb on the scale" in favor of granting protection.[45] Only if these objective and subjective tests are satisfied is *Noerr-Pennington* protection lost and the suit permitted to proceed.

The doctrine has now evolved well beyond its original antitrust confines.[46] For instance, it shields constitutionally protected

---

[39] *Id.* at 62.

[40] *Id.* at 63 (citing *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1879)); *see also* THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS OR THE WRONGS WHICH ARISE INDEPENDENT OF CONTRACT 182 (1879) ("[T]here must be such grounds of belief as would influence the mind of a reasonable person, and nothing short of this could justify a serious and formal charge against another.").

[41] *PREI*, 508 U.S. at 63.

[42] *Id.* at 60-61.

[43] 499 U.S. at 380 (emphasis omitted).

[44] *PREI*, 508 U.S. at 61 (emphasis in original).

[45] *Hanover 3201 Realty, LLC*, 806 F.3d at 180.

[46] *See Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 159-60 (3d Cir. 2001) (summarizing the growth of the doctrine into new fields of law).

protesters from civil suits.[47] It has also been applied by this Court and other courts of appeals to bar § 1983 claims by state actors based upon constitutionally protected conduct.[48] That is the situation here.

### C) Noerr-Pennington *for State Actors*

Nevertheless, Campbell urges a new rule. He suggests that state actors deserve less protection given their wide resources for combating falsities and special positions of public trust. He cites *Gertz v Robert Welch, Inc.* to support such a rule.[49] There, the Supreme Court limited the reach of its "actual malice" libel standard to public figures, making it easier for private individuals to seek restitution.[50] The Court's analysis was influenced by the advantages public officials have in responding to libelous remarks, and by the "necessary consequences" of choosing to enter the public arena.[51]

It is true that in other contexts, restrictions on government speech have been subjected to different degrees of scrutiny under the First Amendment than the speech of private citizens.[52] That variability is compounded here because there

---

[47] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907-08 (1982).

[48] *See Herr v. Pequea Township*, 274 F.3d 109, 116-17 (3d Cir. 2001) (applying this rule, and summarizing similar holding across different circuits (citing *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns., Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988))).

[49] Appellant's Br. at 31 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974)).

[50] *Gertz*, 418 U.S. at 345.

[51] *Id.* at 344.

[52] *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009) ("[I]t is not easy to imagine how government could function if it lacked this freedom. 'If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.'" (quoting *Keller v. State Bar of Cal.*, 496 U.S. 1, 12–13 (1990))); *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006) ("When a public employee speaks pursuant

is some confusion over *Noerr-Pennington*'s applicability to state actors. The Court of Appeals for the Fifth Circuit, for instance, found it axiomatic that "*Noerr-Pennington* protection does not apply to the government, of course, since it is impossible for the government to petition itself within the meaning of the first amendment [sic]."[53]

However, we have already declined to adopt that view. In *Mariana v. Fisher*, we stated: "[w]e know of no Supreme Court or federal appellate case holding that *Noerr-Pennington* cannot apply to government actors . . .".[54] Indeed, it is difficult to envision how such a rule would operate. Stripping state actors of protection would expose them to an unreasonably increased risk of interference. It would uniformly tilt the playing field against them in arenas far removed from the *Gertz* context. That public figures hold enhanced capabilities in responding to libel claims was crucial to the holding there. We are unconvinced that government defendants seeking *Noerr-Pennington* immunity receive similar benefits by virtue of their position. Moreover, the Supreme Court has been careful to extend rights to state actors in many fields, especially when they are acting as market participants.[55] In some cases, the petitions of state actors will be "nearly as vital" as those of private individuals, given the representative role that public institutions play in democratic life.[56] We therefore decline to adopt Campbell's suggestion that PSBA is ineligible for *Noerr-Pennington* protection as a universal rule.

This does not, however, suggest that that *Noerr-Pennington* must necessarily be applied formulaically across

to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees.").

[53] *Video Int'l Prod., Inc.*, 858 F.2d at 1086.

[54] 338 F.3d 189, 200 (3d Cir. 2003)*; see also, Herr*, 274 F.3d at 119 (predicting the Supreme Court would permit municipal governments to receive *Noerr-Pennington* protection).

[55] *See Dep't. of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (describing the states freely entering the marketplace as level participants within the constitutional scheme).

[56] *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000).

11

every field of law. Indeed, some courts confine the doctrine to the antitrust realm, while recognizing a broader immunity that arises from the Petition Clause itself.[57]

### D) Standard of Proof

A different approach outside of antitrust makes particular sense when we consider the necessary standard of proof. A standard of proof is more than a legal barrier. It is "the degree of confidence our society thinks [a fact finder] should have in the correctness of factual conclusions for a particular type of adjudication."[58] This standard may be allocated by Congress, or dictated by the Constitution, but where both are silent, "we must prescribe one."[59]

In *In re Wellbutrin XL Antitrust Litigation*, we explained that the Supreme Court has "indicated that the plaintiff in an antitrust suit has the burden of proving . . . 'both the objective and subjective components of a sham'" when applying *Noerr-Pennington*. [60] We also explained that, in doing so, the Supreme Court "was silent," as to whether that burden had to be satisfied by "clear and convincing evidence, or [by a] preponderance of the evidence."[61] However, since our analysis in *Wellbutrin* did not require us to decide which standard of proof was required to avoid *Noerr-Pennington*

---

[57] *CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1283 (10th Cir. 2020) ("In this circuit, this immunity extends beyond antitrust situations. But we refer to it as Petition Clause immunity, reserving the name, *Noerr-Pennington*, for antitrust cases." (citation omitted)).

[58] *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring); *see also id.* at 371 ("Because the standard of proof affects the comparative frequency of . . . erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each.").

[59] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983).

[60] 868 F.3d 132, 148 n.18 (3d Cir. 2017) (internal quotation marks omitted) (quoting *PREI*, 508 U.S. at 61).

[61] *Id.*

12

immunity, we did not answer that question.[62] Here, the District Court imposed the higher standard and required Campbell to prove the subjective component by clear and convincing evidence.

As a general rule, the Supreme Court instructs that the heightened clear and convincing standard is necessary "where particularly important individual interests or rights are at stake."[63] Nevertheless, "imposition of even severe civil sanctions that do not implicate such interests has been permitted after proof by a preponderance of the evidence."[64] Since *Noerr-Pennington* cases will necessarily involve constitutional rights, a clear and convincing standard initially seems appropriate. Indeed, many courts, including other circuit courts of appeals, have required that level of proof in patent disputes involving *Noerr-Pennington* immunity.[65]

---

[62] *Id.* ("Because our decision in this case does not hinge on the standard of proof, we leave that question for another day.").

[63] *Herman MacLean*, 459 U.S. at 389.

[64] *Id.* at 389–90.

[65] *See, e.g.*, *Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014) ("[T]he burden [is] on the patent challenger to prove invalidity by clear and convincing evidence . . ."); *Intell. Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 708 (D. Md. 2017) (finding that the "exception to *Noerr–Pennington* immunity is narrow, '[g]iven the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence.'" (alteration in original) (quoting *Tyco Healthcare Grp. LP*, 762 F.3d at 1343)) *aff'd*, 937 F.3d 1359 (Fed. Cir. 2019); *Teva Pharm. USA, Inc. v. Abbott Labs.*, 580 F. Supp. 2d 345, 362 (D. Del. 2008) ("To invoke the 'sham' exception, a defendant must prove, by clear and convincing evidence, that a plaintiff's activities were not really efforts to vindicate its rights in court."); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 360 (D. Mass. 2004) (observing that under patent law, "[p]laintiffs must establish the first, objective prong of the sham definition by clear and convincing evidence.").

In the past, the Court of Appeals for the Federal Circuit has required clear and convincing proof in patent disputes.[66] But patents raise a special set of concerns. Because of the innovation and commercial viability that they encourage, courts have afforded suits to enforce patents a presumption of good faith.[67] It naturally follows that a higher standard of proof is needed to overcome that presumption. The Court of Appeals for the Ninth Circuit explains, "[t]he road to the Patent Office is so tortuous and patent litigation is usually so complex," that "no less than [c]lear, convincing proof of intentional fraud involving affirmative dishonesty" would suffice in patent cases.[68]

This case by contrast, arises in the § 1983 realm, and it necessarily reflects a different tension. A balance that makes sense in the patent or antitrust context holds less weight for civil rights litigants, and vice-versa. This is because antitrust disputes must generally strike a balance between First Amendment rights and statutory restrictions on anticompetitive behavior. Justice Black was unwilling in such scenarios to "lightly impute to Congress an intent to invade" the First Amendment right to petition.[69] Here, by contrast, PSBA and Campbell both seek to vindicate their constitutional right to petition. Thus, we cannot simply transplant the standard of proof used to balance a statutory and a constitutional right in order to resolve this clash of matching constitutional ones. We are also reluctant to require a heightened standard of proof here since patent litigation involves a presumption of good faith.[70] No such presumption arises here.[71] Instead, we have a face-off between two identical

---

[66] *See, e.g.*, *Tyco Healthcare Grp. LP*, 762 F.3d at 1345; *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1584 (Fed. Cir. 1993).

[67] *Handgards, Inc. v. Ethicon, Inc.* (*Handgards I*), 601 F.2d 986, 996 (9th Cir. 1979).

[68] *Id.*

[69] *Noerr*, 365 U.S. at 138.

[70] *Handgards I*, 601 F.2d at 996.

[71] The Court of Appeals for the Second Circuit found such logic persuasive even within the antitrust realm, because

interests. The collision produces "an undeniable tension."[72] It would be "intolerable [if] one constitutional right should have to be surrendered [or restricted] in order to assert another."[73]

A heightened standard fails to account for those fundamental constitutional rights, which here are advanced by both sides. As already noted, the District Court required Campbell to establish his First Amendment claim here by clear and convincing evidence. The patent context's presumption of good faith formed the backdrop for that decision. The Court's analysis rested in large part upon *FTC v. AbbVie, Inc.*, which involved an FTC action against a series of sham patent lawsuits.[74] The district court in *AbbVie* relied heavily on the fact that the Court of Appeals for the Federal Circuit has adopted a clear and convincing standard of proof in patent litigation.[75]

Instead of relying on patent law, we look to the relevant standard of proof for the constitutional claims being brought here. In *Crawford-El v. Britton*, the Supreme Court explicitly rejected efforts to impose a higher standard of proof on § 1983 litigants.[76] There, a deeply divided en banc Court of Appeals for the D.C. Circuit had imposed a heightened clear and convincing standard of proof for adjudicating a claim under § 1983. The court reasoned: "If a heightened standard of proof— clear and convincing evidence—was a sound remedy in the area of public figure defamation, we think it is equally so in the cognate area of officer damage liability for constitutional torts . . ."[77]

---

*Noerr-Pennington* itself represents a defensive mechanism for defendants: "by requiring a plaintiff to prove that a defendant's conduct was a sham, the Supreme Court has already struck a rough balance between the competing First Amendment and antitrust interests." *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 813-14 (2d Cir. 1983).

[72] *Simmons v. United States*, 390 U.S. 377, 394 (1968).

[73] *Id.*

[74] *FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 106 (E.D. Pa. 2018).

[75] *See, e.g.*, *Tyco Healthcare Grp. LP*, 762 F.3d at 1345.

[76] 523 U.S. 574, 595-96 (1998).

[77] *Crawford-El v. Britton*, 93 F.3d 813, 823 (D.C. Cir. 1996).

The Supreme Court disagreed. It rejected an across-the-board elevation of the standard of proof for civil rights claims. The Court cautioned that a higher standard of proof "carries a high cost" for "plaintiffs with bona fide constitutional claims."[78] The Court explained that Congress has shown itself perfectly capable of increasing the burden of proof in specific areas (for prison litigation, for example).[79] "Neither the text of § 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provide any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself."[80]

### E) The § 1983 Context

In 1871, Congress created what is now 42 U.S.C. § 1983 as a tool to combat racial discrimination.[81] Today it is a bulwark of liberty, permitting citizens to seek relief when the government, or its agents, wrong them.[82] However, such plaintiffs must surmount several intentionally erected hurdles. "To establish any claim under § 1983, a plaintiff must demonstrate that (1) the conduct at issue was committed by a person acting under the color of state law, and (2) the complained-of conduct deprived the plaintiff of rights secured under the Constitution or federal law."[83] These limitations have been carefully adjusted in recent decades.[84] For instance,

---

[78] *Crawford-El*, 523 U.S. at 595-96.

[79] *Id.* at 596-97.

[80] *Id.* at 594; *see also Herman & McLean v. Huddleston*, 459 U.S. 375, 390 (1983) (permitting a "preponderance of the evidence" standard for claims arising under federal "civil rights laws").

[81] *See Wilson v. Garcia*, 471 U.S. 261, 276-77 (1985) ("By providing a remedy for the violation of constitutional rights, Congress hoped to restore peace and justice . . . through the subtle power of civil enforcement.").

[82] *Id.* at 278 (finding § 1983's protections "are contained in the Bill of Rights and lie at the base of all our civil and political institutions" (internal quotation marks omitted)).

[83] *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 n.6 (3d Cir. 2019).

[84] *See, e.g.*, *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978) (titrating the first requirement); *Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986) (expanding the second).

municipal defendants receive the benefit of heightened fault standards, designed to avoid "open[ing] municipalities to unprecedented liability under § 1983."[85] Plaintiffs must contend with an individual state actor's possible entitlement to different forms of immunity.[86] In addition, only certain remedies are allowed.[87]

A potential § 1983 litigant must therefore navigate an obstacle course erected to protect against a flood of grievances that could deter government actors from their duties.[88] Erecting yet another obstacle by requiring proof by clear and convincing evidence would threaten that careful legislative and judicial balance of competing priorities. The Supreme Court reached precisely this conclusion in *Crawford-El*. There, the Court reasoned that a heightened standard of proof in civil rights disputes, "lacks any common-law pedigree and alters the cause of action itself in a way that undermines the very purpose of § 1983."[89]

---

[85] *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

[86] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

[87] *Compare Edelman v. Jordan*, 415 U.S. 651, 675–77 (1974) (affording sovereign immunity to § 1983 claims for retrospective relief), *with Hafer v. Melo*, 502 U.S. 21, 31 (1991) (permitting suits against state officials in their individual capacities).

[88] *See Wyatt v. Cole*, 504 U.S. 158, 167 (1992) (recognizing the "balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions"); *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982) (reflecting upon the "attempted balancing of competing values" inherent to inquiries into subjective intent).

[89] *Crawford-El*, 523 U.S. at 595.

Accordingly, we have repeatedly held preponderance of the evidence to be the proper standard for § 1983 claims.[90] Our model jury instructions so instruct the District Courts.[91] In imposing this heightened standard of proof where both sides sought to vindicate First Amendment rights, the District Court's approach fails to appreciate the distinction between First Amendment rights and patent rights insofar as the *Noerr-Pennington* doctrine is concerned. Because there is no "[s]upport for imposing a clear and convincing burden of proof" on a § 1983 claim,[92] proof by a preponderance of the evidence remains the appropriate standard here.

## III.

The District Court carefully inquired into Campbell's claims and found they were not objectively baseless. Accordingly, the Court held that Campbell was entitled to *Noerr-Pennington* protection. The Court also reasoned that the actions that gave rise to PSBA's state tort claims were obviously protected by the First Amendment, and PSBA's suit

---

[90] *See, e.g.*, *Baloga*, 927 F.3d at 752 ("To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983 . . . the government may avoid liability if it can show by a preponderance of the evidence that it would have taken the adverse action even in the absence of the protected conduct.") (internal quotation marks omitted); *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016) (citing *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)); *Reichley v. Penn. Dep't of Agric.*, 427 F.3d 236, 244 (3d Cir. 2005) ("The plaintiffs have the burden of establishing liability under § 1983 by a preponderance of the evidence.").
[91] Third Circuit Court of Appeals Model Civil Jury Instruction 4.3 (2019) ("[Plaintiff] must prove both of the following elements by **a preponderance of the evidence** . . .") (emphasis added). *United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010) ("We have a hard time concluding that the use of our own model jury instruction can constitute error . . . .").
[92] *Crawford-El*, 523 U.S. at 594.

was therefore not objectively baseless.[93] Nevertheless, the Court still afforded *Noerr-Pennington* immunity to the State Suit because Campbell had not produced clear and convincing evidence that PSBA's state claims were "subjectively baseless."

Our standard of review of that decision is *de novo*.[94] We will accept for the purposes of this appeal the District Court's well-reasoned conclusion—drawing all inferences in Campbell's favor at summary judgment—that Campbell's RTKL related conduct was not baseless. Because the underlying activity was constitutionally protected,[95] we also accept the District Court's conclusion that PSBA's State Suit is objectively baseless, as the First Amendment protected all of Campbell's alleged activities. Campbell's activities here could not reasonably be construed as defamatory given his allegations and the plausible state actor status of PSBA.[96]

---

[93] The parties disagree about whether the District Court concluded that PSBA is a state actor. While that court properly reserved judgment on the question, it did determine that PSBA is at least a limited public figure and therefore had to establish Campbell's actual malice in the State Suit for it not to have been objectively baseless. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 938-39 (3d Cir. 1990) (discussing the factors relevant to classification as a limited public figure).

[94] *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) ("We review a district court's grant of summary judgment *de novo*, applying the same standard the district court applied.").

[95] A fact that PSBA tacitly acknowledged by pleading "actual malice" in both its initial and amended complaints in the State Suit. App. 428, 699. Had it not been aware of its own public status, this heightened standard would not have been necessary for culpability.

[96] The District Court detailed how each of Campbell's actions against PSBA (including the insulting depiction of its Executive Director, Nathan Mains, on a website entitled "PSBA Horror") had some factual basis, whether obtained through RTKL responses or other sources. Further, Mains and others at PSBA had constructive notice of their public status, introducing a high bar for defamation claims to succeed.

The dispositive question that remains is whether PSBA's State Suit was also subjectively aimed at interfering with Campbell's constitutionally protected conduct.

We agree that Campbell cannot satisfy the subjective prong under the clear and convincing standard. He has failed to establish PSBA's: (1) indifference to the outcome of the suit, (2) insufficient potential recovery to justify bringing the State Suit, or (3) that PSRB "decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process."[97] Campbell's evidence amounts to PSBA's statements, conduct, and choice of attorneys. This evidence does not speak to whether PSBA intended the process itself, rather than its outcome, to achieve its goals. This is not enough.[98]

As we have explained, the District Court's clear and convincing standard imposed too high of a burden on Campbell. We nevertheless will affirm the District Court's grant of summary judgment to PSBA because Campbell's evidence here is insufficient to strip PSBA of *Noerr-Pennington* immunity even under the less onerous preponderance standard.

## IV.

Under that lesser standard, Campbell's evidence needed to demonstrate by a preponderance of the evidence that PSBA intended the State Suit as "use of governmental *process*—as opposed to the *outcome* of that process" as a "weapon."[99] We consider the evidence he offers: first, the statements of PSBA and its members before filing the suit, and second, the manner in which PSBA pursued the suit.

### A) PSBA's statements

Campbell argues strongly that PSBA's own words reveal its motivation in bringing the State Suit "was all about protecting [PSBA's] members" and making Campbell's alleged "harassment of school districts stop."[100] He argues that

---

[97] *PREI*, 508 U.S. at 65.

[98] *Noerr*, 365 U.S. at 139.

[99] *PREI*, 508 U.S. at 50 (emphasis in original).

[100] App. at 1497, 1510-11.

PSBA was motivated to "tak[e] legal action on behalf of its membership."[101] He claims his incessant flood of RTKL requests was causing difficulties for the targeted school districts, and PSBA intended its suit as a mechanism to terminate his RTKL requests. Campbell points to statements from Nathan Mains that PSBA was developing "a significant response" as proof that the organization sought to squelch his activities.[102] He argues that the appreciation of grateful school districts after Campbell's requests ceased proves that this was PSBA's objective in filing the State Suit.[103]

Indeed, PSBA did sue Campbell to get him to stop his RTKL-related conduct and PSBA never attempted to disguise or deny that objective. It criticized Campbell's prolific use of the RTKL requests in its filings before the District Court. In one such filing, PSBA argued: "Campbell is using the RTKL as if he were back in London standing atop his soapbox in Hyde Park."[104] Campbell argues that when he continued filing RTKL requests, PSBA amended its complaint to add his new activities in a further effort to silence him.[105]

### B) PSBA's actions

Second, Campbell argues that PSBA used the legal process to punish him. He claims the attempt to punish him began before filing the State Suit, when PSBA demanded that he remove the parody of Nathan Mains and desist from further "defamatory" statements.[106] Then, when the State Suit was filed, PSBA's attorneys requested Campbell retain documents from the past seven years. But there is nothing punitive about asking an opposing party to preserve documents relevant to litigation, and we will not here attempt to erect some kind of time restriction on such a request. Moreover, Campbell's argument that such a request was intended to be punitive is laden with irony given the voluminous records requests Campbell has repeatedly directed at school boards across the state.

---

[101] App. at 312.

[102] App. at 140.

[103] App. at 155, 163.

[104] ECF No. 18 at 15.

[105] Appellant's Br. at 53.

[106] App. at 138.

Finally, Campbell claims PSBA's motives were laid bare by its distribution of the State Suit complaint to its members, though it contained claims that were later discounted as untrue, and by PSBA's settlement demand that Campbell stop attacking PSBA and its staff.[107]

*C) Analysis*

At summary judgment, we are charged with viewing Campbell's evidence "in the light most favorable to the party opposing summary judgment, and resolv[ing] all reasonable inferences in that party's favor."[108] Yet even under this deferential standard, we cannot discern a single quantum of evidence, amidst the mountain of facts that Campbell provides, that would support a conclusion that PSBA aimed to use the process of the suit, as opposed to a successful outcome, to accomplish its objective: ending Campbell's RTKL onslaught. We readily agree that PSBA's eagerness to achieve this goal radiates from each incident he complains of. However, that does not prove that the suit itself, as opposed to prevailing on the merits, was PSBA's subjective motivation.

Indeed, the record indicates that PSBA wanted Campbell to stop overwhelming its members with RTKL requests and that it filed the State Suit in hopes of accomplishing that goal. The fact that PSBA readily accused Campbell of defamation, that it sought to terminate his activities, and that it celebrated its progress in achieving that goal simply fails to satisfy the subjective prong, even by a preponderance of the evidence.

PSBA's leadership harboring personal animus against Campbell does not establish that the State Suit was subjectively baseless. If animus alone were the test, it would readily devour the rule, since litigation is rarely sparked by feelings of warmth and amity. The protection of *Noerr-Pennington* immunity cannot be swept away by simple dislike.

Accordingly, Campbell simply cannot satisfy the subjective prong by a preponderance of the evidence. Because this case must be decided on the record before us at summary

---

[107] App. at 173-74, 303-04, 1484-86.

[108] *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

judgment, "[w]e need not remand to the District Court to consider it in the first instance."[109]

## V.

For the reasons set forth above, we will affirm the District Court's grant of summary judgment.

---

[109] *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 306 (3d Cir. 1999) (citing *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co.*, 93 F.3d 1064, 1072 (2d Cir. 1996) ("An appellate court has the power to decide cases on appeal if the facts in the record adequately support the proper result . . .")).